Good morning. Good morning, Your Honors. Armelas Daly and Gomo appearing on behalf of Mr. Lucas-Hernandez. And I'd like to reserve two minutes for rebuttal, Your Honor. Because an opposing party's statement is an important carve-out of the hearsay rule and presents a unique evidentiary question, there is a foundational test. It is non-hearsay that is dependent on the actual words the declarant used, so we have to be sure about what was said before such evidence can be introduced. And so when the government attempts to introduce the agent's translated statement as non-hearsay and that agent's language proficiency has been placed at issue, the government must either, one, introduce the agent's actual words and have them translated by a court-certified interpreter, or two, establish and lay a sufficient foundational facts that would allow the trier of fact to conclude that the statement is indeed the defendant's claim. Counsel, I guess a question that I have when I was reviewing the record, did the government ever admit into evidence the words that Mr. Lucas-Hernandez actually said, the actual words that were said? The government did not, and that's our problem here, Your Honor, and why we're on appeal. Had they had the agent testify in Spanish about what was said in this field, we probably would not be able to raise this issue. The agent only testified as to his understanding of what he asked Mr. Lucas in the field and then his understanding of what Mr. Lucas responded. We don't know the actual words, and when we turn to examples... The holding in Nazemian, which was a true interpreter case. You're asking us now to hold that whenever someone converses in Spanish with a defendant that there has to be a qualified interpreter in court translating what the, in this case, border agent said in Spanish to English and what he said, the defendant said in Spanish into English. Something that's never been done. And to be clear, Your Honor, we are not asking that it be expanded or that it be applied in every case. We're only asking that it be applied to situations where the language proficiency has been placed at issue. But there was a lengthy... There was lengthy testimony and cross-examination about his proficiency in asking three questions and his proficiency in understanding the answers in Spanish of yes or no or Mexico. The problem, Your Honor, is that the precondition, the threshold inquiry that the magistrate judge needed to make was whether that testimony could be equally attributed as being Mr. Lucas' own statement. And so although there was testimony that he answered, that he asked the same questions, if we turn to the case of Ramos, for example, that deportation officer also said she asked similar questions and the same questions and that they had immigration detainees that were processed at that detention center upwards of 1,500 a day. But then when she actually testified in Spanish through a court-certified interpreter about what her question was, that interpreter said it was nonsensical in part. She wouldn't even know how to begin to translate that question. And so we have to know the actual words to be able to assess the pronunciation, how the question was asked. So I had thought about this question similar to Judge Bolton had just mentioned. We're talking about Mexico, yes and no. But then I was rereading the rule, specifically Federal Rule of Evidence 801 about the party opponent. But we actually have to know the question, the words used for the question. So it's not just those three words. It's what was it that was spoken to the person who's the listener? And then what was it that they then stated? I absolutely agree, Your Honor. I do also agree that the focus needs to be on the question almost more so than the answer. For example, the agent testified that he asked three questions. What country they were from, whether they had any immigration documents that allowed them to be in the U.S., and whether they had entered the U.S. illegally. Let's just take that first question, what country are you from? Did he ask, are you from Mexico? Did you come from Mexico? Were you born in Mexico? All of those could elicit a different response. And all of those questions, depending on the pronunciation and the nuances in verb-subject-object agreement, verb-tense disagreement, it's important to know what was asked to understand then what Mr. Lucas responded yes or no to. Even taking the second question. But during this trial, did you ask? So the defense counsel did ask on cross-examination. He did get into some of the Spanish language proficiency issues, but again... So they did not ask for the agent to testify as to the Spanish words. But that's skipping, once again, the precondition that on pretrial it was raised. They were put on notice. The defense counsel filed pretrial motions saying, we don't know what was actually said. No inquiry was taken about whether or not that statement can be equivalent, whether the agent's testimony could be equivalent to the statement. The Nazamian factors, which although not directly the same circumstances here, they can provide helpful guidance for the judge to figure out, can this statement be equal? It's not synonymous. The agent's testimony is not synonymous to what Mr. Lucas said, especially when the language proficiency was placed at issue pretrial. But then at trial, the language proficiency was explored extensively on cross-examination about how many, what his training had been, how long he had been a Border Patrol agent, how long he'd been asking these three questions. His testimony that he understood, that he was trained to ask these three questions, it's not an interview at the processing. It's three questions to determine whether or not the person's going to be detained. This is completely explored, but nobody in cross-examination said, well, testify now in Spanish as to what the question was, or testify in Spanish as to what the answer was. Instead, this comes up on appeal. There's no request for an interpreter. There's no request to do any of that. But there's a lot of testimony about his language proficiency with respect to these very limited inquiries. And again, Your Honor, that question was asked, but the burden of admissibility is on the government. And so, again, at the beginning in pretrial, when they had the pretrial hearing, there was a ruling, and the defense counsel was essentially precluded from probing further about the Nazamian factors because the judge said, it's a statement by party opponent. And in its responsive brief to defense counsel's pretrial motion, the government said, when I call the agent, I will lay the proper foundation. The government did not do that, and the magistrate judge did not ask him to do that. They did get in cross-examination. One point, that even if we were to buy this argument, doesn't the government have another way out here, that there's no reason for, or no ability for this individual to even stay in the United States? There's no legal basis for them to do that. Well, we don't know what the central element, one of the central elements was alienage, and that's where the Spanish language proficiency comes into place because alienage was so important. And even during the prosecutor's closing, the judge interrupted him and said, okay, I understand that you think the statement corroborated with other evidence is enough to establish alienage. The prosecutor never argued that without Mr. Lucas's statement, that there would be enough corroborating evidence for alienage. In fact, that would be improper because those were primarily, that corroborating evidence primarily went to his mode of entry, computer database search, things that were brought up in immigration proceedings which have a lesser burden, clear and convincing evidence rather than reasonable doubt. And so they wouldn't have had enough without Mr. Lucas's statement. I think, is the government arguing differently though? Well, we'll ask the government when they testify. Even without his three answers, there was a lot of other evidence in the record, including his immigration record, but the circumstances under which he was found, where he was found, that would have been enough. The government is arguing that, and we would, again, that standard, the different burdens that the government has in an immigration proceeding versus a criminal proceeding, we would say differs, and so there wouldn't be enough. But the other issue is that this involves an admission. This involves a confession. And so that is weighted more heavily for confessions. When there's an admission of confessions, it's hardly ever or seldom considered to be harmless. Counsel, I know you wanted to save some time. Do you want me to give you a couple minutes at the end? I was just going a little bit more into the harmlessness, Your Honor, and again, because this was a... Well, why don't I do this? Let me save a couple of minutes for you, and then you can have that time afterwards. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors, and may it please the Court. Parker Gardner Erickson on behalf of the United States. This Court should affirm the admission of Mr. Lucas Hernandez's field admissions into evidence because they were properly admitted as opponent party statements under Federal Rule of Evidence 801D2A. Mr. Lucas Hernandez was approached by Agent Mahler at the bottom of a 20-foot sand ditch where he was asked the question, What country are you from? Well, but the problem is we know that the agent says that that is his understanding of what he asked him in Spanish, but we don't know what words were said to him. The agent did testify that that is the question that he asked him, and there was no question. Well, that's my understanding of the Spanish words I said to him. In English. I'm telling you in English my understanding of what the Spanish words I said to him. That's all they could have said, right? That's the testimony, Your Honor, yes. The agent Mahler, over approximately a dozen years on the job, had asked these same three questions. He also says he can't carry on a conversation in Spanish. Yes, Your Honor, but he was trained for two months at the Border Patrol Academy to speak Spanish, and he did ask these questions. Well, he was trained for two months at the Academy, in the course of which they did some Spanish, but yes. Right, right. Presumably. Well, I do come back. I'm glad you cite the rule because I do come back to the rule, and the rule states that the party appointed exceptions to hearsay provides that when the statement, made by the party. That's the whole problem, isn't it? Made by the party. What were the words that were made by the party when we don't know what is being asked? We know that he said, the agent said what his interpretation was, but we don't know what the question was because those words were never part of the record that were evaluated. I would say that the agent testified to what he told. What he understood. Correct, Your Honor. So what he understood, what he translated, his understanding of the question and then his understanding of the answers. Yes, Your Honor. I think that's just the way that language works is we understand words that are said to us. So his understanding of what he told Mr. Lucas Hernandez is what country you're from. He replied, Mexico. But the words were never stated in court. It was the actual words, right? So what he was testifying to was not the words that he spoke or the words that Mr. Lucas Hernandez spoke, but instead his understanding or his translation of what he said and what the defendant said. Yes, Your Honor. So the question is, how is this different from Nazimi? I mean, it's different from Nazimi, but how is it different in a relevant way from Nazimi? Well, I think the biggest issue here, Your Honor, is the fact that Mr. Lucas Hernandez did not indicate when he was being questioned by Agent Mueller whether or not he had misunderstood him. So if Agent Mueller had asked what country you're from and he said, Mr. Lucas Hernandez responded, I don't have change on me, then there would be an issue of language here. But that's an application of Nazimi. You're saying, in essence, he was operating as a language conduit because there was really no dispute about what was said and so on. So that would lead you to an inquiry like the inquiry on Nazimi, but it wouldn't lead to the conclusion that you don't have to have any inquiry into that. Now, you could say, well, maybe there was a sufficient inquiry because we know... But what we know is that this guy's Spanish wasn't so terrific, to put it mildly. So we don't know how a Nazimian inquiry would come out or a Nazimian-like inquiry. You're arguing for no inquiry. You're arguing that he could have just got in there and said anything. Would there have to be any inquiry into how good his Spanish was or whether he even had any Spanish? I mean, there was an inquiry into his Spanish. I want to know, what's the standard? If he had just got up there and said, well, I know enough Spanish to understand... I asked him this question in what I understood to be Spanish and he answered it in what he understood to be Spanish, and there was no further inquiry into why he thought that or what his Spanish background was. The prosecuted underlying case did go through his qualifications to understand Spanish. And again, we're dealing with questions of what country you're from, do you have papers to be in this country legally... But that right there means that there has to be... that there's a recognition that this isn't the same thing as somebody testifying to what someone else said in their mutual native language. The fact that you had that inquiry at all. So the question is, what's the inquiry? I believe at trial the proper foundation was laid. The magistrate judge reserved to allow for a foundation to be laid at trial that he was sufficiently proficient in Spanish so that he could communicate with Mr. Lucas Hernandez and then testify to the responses that he received therefrom. I think pivoting back to Nazemian here too, the question is, who would Agent Mahler have been a mere conduit of language to? Nazemian doesn't apply because it's always a third-party interpreter case. Moreover... But that's the facts of it. But the reason for it is because the person is not actually saying those words. And that's true here. I wouldn't say that that's true here, Your Honor. As far as the record reflects, the only person who testified to the meaning of those words in the cross-examination that occurred was Mr. Lucas Hernandez admitted to being a Mexican citizen without documents to be in this country legally, and he'd enter this country illegally. So switching back to Nazemian, I think one of the bigger issues too, in addition to Mr. Lucas Hernandez and Mr. Agent Mahler not having an interpreter, was that there was no extrajudicial interpretation of Mr. Lucas Hernandez's testimony. The translation that was given by Agent Mahler was given in court and was therefore not extrajudicial. Nazemian addressed how to treat extrajudicial statements made through an interpreter when they had a testifying witness that didn't understand the original language of the testifying witness, of the declarant, and that could only speak to the translated statements of the interpreter. So Nazemian itself does not apply here. Could the magistrate judge have found Mr. Lucas Hernandez guilty without his admissions? Yes, Your Honor. Given the testimony of the other Border Patrol agent who testified to the fact that in his A-file there was approximately 12 prior times that he had been deported, that he was found 16 miles east of the Ducate, California, port of entry, 3 1⁄2 miles north in a remote, rugged, sparsely populated area at the bottom of a 20-foot sand ditch, all of those factors indicate independently that Mr. Lucas Hernandez had entered the country illegally. Unless the Court has any further questions. Any other questions? None. Well, I'm still trying to puzzle out what standard you're arguing for, because you seem to be saying that, really, that something like Nazemian was actually met here. Is that what you're saying? Because there was an inquiry into this person's Spanish competence and the magistrate thought it was sufficient. Thank you for the opportunity to clarify. I'm only using the fact that his Spanish was proficient to say that Nazemian doesn't apply. His Spanish wasn't proficient. We know it wasn't proficient. It might have been good enough for this marginally, but it wasn't proficient. Yes, Your Honor, and that's the point, is it was proficient enough for this. So I think the larger point is this is also just a party admission under 801 D2A, so it's a lay witness testifying to what he saw and heard. So I know the Court is inquiring into the question, but then I also think... I'm sorry. I just keep repeating. He wasn't testifying to what he saw and heard because he wasn't testifying to what he heard. Because what he heard was Spanish. Yeah. Meco, no, and yes. Those are very similar words. Well, to me, the bigger concern is what he said, right? Because I think counsel pointed out in some of the various questions in which you can ask those questions. I mean, I think that's the concern. And so what we're having to accept is the agent's understanding of what those words meant that he said. And I think we can also look to Mr. Lucas Hernandez's response to those questions as testified by Agent Muller. Again, Agent Muller testified that there was no misunderstanding, that he didn't appear to have trouble communicating with Mr. Lucas Hernandez or the other two individuals who were there with him. So there's no other record of any misunderstanding. But in terms of the possibilities for inaccuracy and mistranslation, it's considerably higher in these circumstances than is in his circumstance, actually. Both in the sense that this person seems to have less competence and more reason to not be very accurate. I wouldn't say that that gives Agent Muller more reason not to. He's conducting an investigation to determine whether or not an illegal entry has occurred. Unless the Court has further questions. Thank you, Your Honor. Thank you. Thank you. Your Honor, once again, addressing why the actual words matter. I know the government said that Mr. Lucas never expressed not understanding what the agent said. But again, I turn to the Ramos case where that deportation officer also said that she felt that the detainee understood. And that court found that in a detainee understanding or her feeling that a detainee understood her broken attempts to speak Spanish was insufficient, especially when there was not an interpreter there. But she was asking much different questions. She was performing an interview in a processing station asking something beyond three simple questions. She was asking questions that she considered to be standard questions, questions about finding... But she was interviewing him. Correct. She was interviewing them with regard to signing a stipulated removal order. But again, it was a situation where she asked the same questions. She asked the question hundreds, if not thousands, of times. But then when she actually had to testify to the actual words that she said in Spanish, it was not understood, and the interpreter could not translate them. Any final point? No, Your Honor. Thank you. Thank you. Thank you. A matter of Lucas Hernandez will stand submitted. And we will take a short recess at this time.
judges: BERZON, MENDOZA, Bolton